— FOR REPORTER PUBLICATION —

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 14-60048-CIV-GAYLES

**FEROX, LLC,**
    Plaintiff,

  v.

**CONSEAL INTERNATIONAL, INC.;**
**EARTH ECO RESEARCH, LLC;**
**GENESIS PURE, INC.; and GREEN FOOT**
**GLOBAL, LLC,**
    **Defendants.**
               /

**CONSEAL INTERNATIONAL, INC.,**
    Counter-Plaintiff,

  v.

**FEROX, LLC,**
    Counter-Defendant.
               /

## ORDER

**THIS CAUSE** comes before the Court on two Motions for Summary Judgment: one filed by Defendant/Counter-Plaintiff ConSeal International, Inc. ("ConSeal"), and Defendants Earth Eco Research, LLC ("Earth Eco"); Genesis Pure, Inc. ("Genesis"); and Green Foot Global, LLC ("Green Foot") (collectively, the "Defendants") [ECF No. 42], and one filed by Plaintiff/Counter-Defendant Ferox, LLC ("Ferox") [ECF No. 45].

Ferox and ConSeal are both manufacturers of ferrocene-based fuel additive products that require registration with the Environmental Protection Agency ("EPA"). Ferox brought this action against ConSeal and the other Defendants (ConSeal's distributors) alleging infringement of U.S. Patent No. 7,959,693 (the "'693 Patent"), relating to certain fuel additive products containing a

combination of ferrocene and biphenyl. Ferox accuses ConSeal of manufacturing and selling products with the same chemical composition as a product of Ferox's that is covered by the '693 Patent (the "Accused Products"). In their Answer, the Defendants state that a 2009 agreement between ConSeal and Ferox regarding access to EPA-required health and safety testing data (Defs.' Mot. Ex. 18, hereinafter the "Agreement"[1]) contained a license to ConSeal to manufacture its own products of this specific chemical composition, which acts as a complete defense to Ferox's claim of patent infringement. ConSeal separately advanced a counterclaim for fraudulent inducement against Ferox, alleging that Ferox made false representations of fact to induce ConSeal to enter into the Agreement.

The Court has considered the briefs, the exhibits attached thereto, and the applicable law. For the reasons that follow, the Defendants' motion shall be granted as to the license issue and Ferox's motion shall be granted as to the fraudulent inducement counterclaim. The motions shall otherwise be denied.

## I.   FINDINGS OF FACT[2]

Ferox (and its predecessors) and ConSeal have both been manufacturing and selling fuel additive products for several decades. More than a decade ago, W. Wesley Parish, a managing member of Ferox between 2008 and 2014, developed a particular fuel additive product that

---

[1]   ConSeal refers to the agreement the parties executed as the "License Agreement" and Ferox refers to it as the "Relabeling Agreement," so the Court will refer to it simply as the "Agreement."

[2]   "Because there are cross-motions for summary judgment on the exact same issues, it is impossible to merely cast the facts 'in the light most favorable to the non-movant,'" as required by the legal standard governing summary judgment motions, *see infra* Part II, "as each side is both movant *and* non-movant." *Crane v. Holder*, 66 F. Supp. 3d 1391, 1396 n.5 (N.D. Ala. 2014).

"The court finds it impractical and unnecessary to set out different sets of facts, for the same situation, when the parties have filed cross-motions for summary judgment on the same counts, discussing the same issues, and the same nuances of law. It benefits neither the court nor the parties. . . . To make a decision regarding each motion for summary judgment, the court will rely on those facts in Plaintiff's motion for summary judgment that are undisputed and supported by the record and Plaintiff's attached [statements of facts], those facts in Defendant's motion for summary judgment that are undisputed and supported by the record and Defendants' attached [statements of facts], as well as the evidence the parties have placed on the record." *Reid v. City of Atlanta*, No. 08-1846, 2010 WL 1138456, at *1 (N.D. Ga. Mar. 22, 2010).

2

combines a fuel-soluble ferrocene (iron) compound with biphenyl, an inert carrier. Ferox filed a patent application on this invention in 2005, and on June 14, 2011, the U.S. Patent and Trademark Office issued the '693 Patent to Parish and Michael D. Thompson. Ferox, LLC, is listed as the assignee of the Patent.

Ferrocene-based fuel additive products require EPA registrations before they can be manufactured and sold for gas and diesel on-road use. To obtain those registrations, applicants seeking to register an additive must provide specific health and safety effects data—referred to as "Tier 1 data"—under 40 C.F.R. Part 79. Obtaining sufficient data for fuel additive products is a lengthy and expensive process—lasting up to two years and costing somewhere between two million and five million dollars. That said, an applicant seeking a fuel additive registration is permitted to rely on another party's Tier 1 data if that applicant meets certain requirements under 40 C.F.R. Part 79.

Econalytic Systems, Inc. ("Econalytic"), a third party, already possessed sufficient Tier 1 data. Prior to 2007, Ferox relied on Econalytic's Tier 1 data to obtain EPA registrations for its fuel additive products. In or around 2007, Econalytic stopped selling ferrocene to Ferox, and Ferox was no longer entitled to rely on Econalytic's Tier 1 data to obtain EPA registrations for its fuel additive products. Ferox submitted a demand for arbitration in 2008, seeking a decision that would require Econalytic to either sell Ferox ferrocene or allow Ferox to rely on Econalytic's Tier 1 data in exchange for appropriate reimbursement. In the interim, Ferox decided that obtaining its own Tier 1 data was not a good option due to the aforementioned cost and time requirements.

In Spring 2008, ConSeal's principal, Steve Perry, began communicating with Parish. Ferox was aware that ConSeal was a manufacturer of ferrocene-based fuel additive products and was selling those additives to distributors. The two entities spoke about Econalytic's Tier 1 data.

During this time, Ferox developed the idea of purchasing permanent access to Econalytic's Tier 1 data and began to communicate with Econlaytic regarding same.

ConSeal also needed access to Tier 1 data in order to sell fuel additive products. In an email from Parish to Perry, dated November 15, 2008, with the subject "Cost sharing," Parish, in discussing the potential costs of accessing Econalytic's Tier 1 data, wrote, "By the time we pay Econalytic Systems the $200,000 to access their Tier 1 submission, their Tier 2 data and test results for gasoline and diesel, this deal will have cost us more than $250,000. Please confirm that you are willing to split these costs." Defs.' Mot. Ex. 8. He further wrote, "The proposed payment schedule [between Ferox and Econalytic] is $25,000 upon execution of the agreement, $25,000 in 90 days, $50,000 at 12 months, $25,000 at 18 months, $50,000 at 24 months and $25,000 at 30 months for a total of $200,000." *Id.* Two days later, Perry replied, "Our 50% is no problem so let me know when what and where." *Id.* (all errors [sic]).

John Hill, a Ferox principal, testified that ConSeal knew Ferox was entering into an agreement with Econalytic regarding access to the Tier 1 data. On December 9, 2008, Hill wrote an email to Perry, stating, "The way the agreement [between Ferox and Econalytic] is worded right now, if we were late on a payment [Jack Kracklauer, a principal of Econalytic] can cancel the agreement and notify the EPA and cancel our registration. I don't think we would ever be late on a payment, but that is a lot to hold over our head, which is why I am hesitant unless I know that the money is there upfront." Defs.' Mot. Ex. 10; *see also* Defs.' Mot. Ex. 7 (Hill Dep.) 19:14-20:11, 16:20-17:1. Perry responded: "Hey, I am on with Wes. Please don't be concerned about the $. It's not just words John. We've gone over what Jack wants, and I am in agreement with Wes." Defs.' Mot. Ex. 10.

As early as December 22, 2008, Ferox knew that it would need to pay only $185,000 to Econalytic in satisfaction of their agreement. No one from Ferox informed anyone from ConSeal

that Parish's initial estimate of $250,000 was different than the amount Ferox would ultimately pay to Econalytic.

Following several rounds of revisions, ConSeal and Ferox executed the final version of the Agreement on February 12, 2009. Section 4.1 of the Agreement provides:

> Ferox hereby grants to ConSeal a perpetual, non-exclusive, irrevocable right to select, use and rely upon Ferox's present and any future fuel additives based on Tier 1 Data for Ferox's EPA-registered Iron Atypical Diesel Fuel Additives and Iron Atypical Gasoline Fuel Additives for private label manufacture, sale and distribution by ConSeal as "relabeled additives" under the relabeling provisions of 40 CFR part 79.

Agreement § 4.1. Section 4.2 provides:

> The terms and conditions related to the supply to ConSeal of any Iron Atypical Diesel Fuel Additives or Iron Atypical Gasoline Fuel Additives manufactured by Ferox will be specified in separate agreements to be negotiated between the Parties from time to time.

*Id.* § 4.2. Section 5 of the Agreement, regarding payment, provides:

> In exchange for the rights granted in Section 4, ConSeal will pay to Ferox a Use Fee in the total amount of $125,000.

*Id.* § 5. The Agreement also contains an integration clause under Section 11.3, which reads:

> <u>Entire Agreement; Amendment</u>. This Agreement constitutes the entire understanding and agreement among the Parties with reference to the subject matter hereto and they supersede all other provisions, communications, proposals, representations and agreements, whether oral or written, relating to the subject matter of this Agreement. This Agreement may be amended only by a written amendment to the Agreement executed by all of the Parties.

*Id.* § 11.3. Finally, Section 11.9 of the Agreement provides:

> <u>Construction</u>. The Parties have had the benefit of personal counsel and fully understand the terms of this Agreement. Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Party hereto. This Agreement shall not be construed against either Party by virtue of a Party being deemed the Agreement's drafter . . . .

*Id.* § 11.9. The parties executed the Agreement. Thereafter, ConSeal paid $125,000 to Ferox.

As planned, Ferox also entered into a "Confidential Data Rights Agreement" with Econalytic to purchase access to Econalytic's Tier 1 data (the "Ferox–Econalytic Agreement"). This agreement was partially executed on February 12, 2009, and became effective the next day. In satisfaction of this agreement, Ferox paid $185,000—the amount agreed upon by Ferox and Econalytic—to Econalytic.

After the Ferox–Econalytic Agreement was executed, Ferox obtained several registrations for various Ferox fuel additive products based on and referencing Econalytic's Tier 1 data. One of those EPA registrations was for Ferox Powder 100, a blend of biphenyl and ferrocene.[3] After Ferox received these new registrations based on the Tier 1 data, Ferox applied for a registration for ConSeal for "HeMax™-2-T"[4] based on Ferox Powder 100. Parish emailed Perry on July 28, 2009, informing him of the same and telling him that HeMax™-2-T was a biphenyl–ferrocene blend. However, Ferox never provided ConSeal with the EPA registrations that Ferox obtained for ConSeal for HeMax™-2-T. Ferox never inquired whether ConSeal intended to sell Ferox products with the HeMax™-2-T label, and Ferox and ConSeal never entered into any other agreements after the initial Agreement.

Between July and September 2009, ConSeal obtained its own access to Tier 1 data from Econalytic.[5] With now-independent access, ConSeal began manufacturing its own fuel additives and registering them with the EPA under its newly acquired Tier 1 data. In May 2010, Ferox sent ConSeal a letter accusing it of improperly manufacturing fuel additive products (the Accused Products, composed of the same biphenyl–ferrocene blend as Ferox Powder 100) in contravention of the Agreement and the '693 Patent.

---

[3]  Upon request of the parties, the precise ratio of the two chemicals will not be disclosed.

[4]  "HeMax™-2-T" is ConSeal's internal name for the Accused Products.

[5]  ConSeal had entered into a settlement agreement with Econalytic to resolve pending litigation, and as part of that settlement agreement, Econalytic agreed to grant ConSeal access to its Tier 1 data.

## II.  PROCEDURAL HISTORY

Ferox originally filed an action in the United States District Court for the District of Utah, alleging infringement of the '693 Patent. *See* Compl., *Ferox, LLC v. ConSeal Int'l, Inc.*, No. 11-1055, ECF No. 2 (D. Utah Nov. 16, 2011). In January 2011, ConSeal filed a motion to dismiss or transfer the case to this District. *See* Memorandum Decision & Order, *Ferox, LLC v. ConSeal Int'l, Inc.*, No. 11-1055, ECF No. 94 (D. Utah Jan. 3, 2014). The court granted the motion, concluding that venue was improper under the Agreement's forum selection clause,[6] and dismissed the case.

Ferox refiled the case in this Court and filed an Amended Complaint on February 18, 2014. Ferox brings claims for patent infringement and unfair competition against each Defendant, as well as claims for false advertising against Genesis and Green Foot and false marketing against Green Foot. The Defendants later amended their answer to include an affirmative defense alleging an implied license.

The parties filed cross-motions for summary judgment. The motions, now ripe before the Court, both turn on the same two issues: (1) whether the Agreement (specifically, section 4.1) grants ConSeal a license to manufacture the Accused Products; and (2) whether Ferox fraudulently induced ConSeal to enter into the Agreement.

## III.  LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. —, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted); *see also Alabama v.*

---

[6]  The forum selection clause required that any litigation brought **by Ferox** arising out of or relating to the Agreement, its transactions, or its relationships be brought in the U.S. District Court for the Southern District of Florida (or in the Circuit Court in and for Broward County, Florida, should the federal court not have jurisdiction over the dispute). Agreement § 10.2. The clause also required that any litigation brought **by ConSeal** be brought in the U.S. District Court for the District of Utah (or in Utah County state court, if the Utah federal court did not have jurisdiction). *Id.*

*North Carolina*, 560 U.S. 330, 344 (2010). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

An issue is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "Where the material facts are undisputed and all that remains are questions of law, summary judgment may be granted." *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, — F.3d —, 2016 WL 659222, at *9 (11th Cir. Feb. 18, 2016).

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

## IV.  DISCUSSION

The United States Court of Appeals for the Federal Circuit has "exclusive jurisdiction . . . of an appeal from a final decision of a district court of the United States . . . in any civil action arising under . . . any Act of Congress relating to patents." 28 U.S.C. § 1295(a)(1). Thus, the Federal Circuit's rulings on substantive patent law are binding on this Court. *See, e.g.*, *Arlaine &*

8

*Gina Rockey, Inc. v. Cordis Corp.*, No. 02-22555, 2004 WL 5504978, at *17 n.5 (S.D. Fla. Jan. 5, 2004) ("Decisions by the . . . Federal Circuit . . . provide controlling authority on the aspects of this case that are unique to patent law[, and] [d]ecisions by the Eleventh Circuit govern issues that are not unique to patent law . . . .").

### A. *License*

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation and internal quotation marks omitted); *see also Leatherman Tool Grp. Inc. v. Cooper Indus., Inc.*, 131 F.3d 1011, 1015 (Fed. Cir. 1997) (stating that a patent "provide[s] a limited right to exclude others from making, using, or selling a claimed invention for a limited period of time"). A license to make or sell, however, is a defense to patent infringement, as the patentee, through the grant of a license, "convey[s]" to the licensee "a freedom from suit." *TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009).

"The interpretation of private contracts is ordinarily a question of state law." *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1314 (11th Cir. 2010) (quoting *Chira v. Saal* (*In re Chira*), 567 F.3d 1307, 1311 (11th Cir. 2009)) (internal quotation marks omitted). This principle extends to agreements granting a license. *See, e.g.*, *Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., L.L.C.*, 596 F.3d 1313, 1328 (11th Cir. 2010) (explaining that a court must apply state law in its analysis of the breach of a copyright license agreement); *cf. Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*, 716 F.3d 586, 591-93 (discussing breach of a license agreement analyzed under the law governing the agreement). The Agreement here provides that it will be interpreted and construed in accordance with Florida law. *See* Agreement § 10.1. "Contract and statutory interpretation are both questions of law appropriately decided on summary judgment." *Bastian v. United Servs. Auto. Ass'n*, — F. Supp. 3d —, 2015 WL 8581555, at *2 (M.D. Fla. Dec. 10, 2015)

9

(citing *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011); *Rectory Park, L.C. v. City of Delray Beach*, 208 F. Supp. 2d 1320, 1329 (S.D. Fla. 2002)).

Under Florida law, "[c]ontract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties['] intent at the time of the execution of the contract." *Spungin v. GenSpring Family Offices, LLC*, 883 F. Supp. 2d 1193, 1198 (S.D. Fla. 2012) (quoting *Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. 1st DCA 2009)) (internal quotation marks omitted). "In the absence of an ambiguity on the face of a contract, it is well settled that the actual language used in the contract is the best evidence of the intent of the parties, and the plain meaning of that language controls." *Id.* (quoting *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So. 2d 738, 739 (Fla. 1st DCA 1989)) (internal quotation marks omitted). If a court determines that the terms of a contract are ambiguous, only then is "parol evidence [] admissible to explain, clarify or elucidate the ambiguous terms." *Id.* (quoting *Taylor*, 1 So. 3d at 350-51) (internal quotation marks omitted). "[T]he words should be given their natural, ordinary meaning," and "where the language is plain a court should not create confusion by adding hidden meanings, terms, conditions or unexpressed intentions." *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996).

As stated above, Section 4.1 of the Agreement provides:

> Ferox hereby grants to ConSeal a perpetual, non-exclusive, irrevocable right to select, use and rely upon Ferox's present and any future fuel additives based on Tier 1 Data for Ferox's EPA-registered Iron Atypical Diesel Fuel Additives and Iron Atypical Gasoline Fuel Additives for private label manufacture, sale and distribution by ConSeal as "relabeled additives" under the relabeling provisions of 40 CFR part 79.

Agreement § 4.1. The "relabeling provisions of 40 CFR part 79" referenced in this section define "relabeled additive" as "a fuel additive which is registered by its original manufacturer with EPA and is also registered and sold, unchanged in composition, under a different label and/or by a

different entity." 40 C.F.R. § 79.50. The Accused Products fall squarely within this meaning: biphenyl–ferrocene fuel additive blends that were registered by their original manufacturer—Ferox, as Ferox Powder 100—and registered and sold, unchanged in composition, under a different label—HeMax™-2-T—and by a different entity—ConSeal. The definition of "relabeled additive" contemplates this precise situation.

Ferox cites to the legislative history of the regulations implementing the Clean Air Act and the EPA's summary of these regulations in support of an argument that "a relabeler [] acquire[s] its fuel additive from a third party, not mak[es] it itself" and that "[g]iving ConSeal the right to make the additives would skirt the evaluation and testing requirements of the program." Pl.'s Opp'n at 10. However, courts "must presume that Congress said what it meant and meant what it said." *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). The Eleventh Circuit has repeatedly instructed that the construction of a statutory provision—or, in this case, a regulation—begins "where courts should always begin the process of legislative interpretation, and where they often should end it as well, . . . with the words of the statutory provision." *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc). "When the import of words Congress has used is clear . . . [courts] need not resort to legislative history, and [they] certainly should not do so to undermine the plain meaning of the statutory language." *Id.* at 976. "In other words, '[w]hen the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: judicial inquiry is complete." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997)) (alterations in original).

The plain meaning of 40 C.F.R. § 79.50 is that two distinct entities can manufacture a relabeled additive: the "original manufacturer" (in this case, Ferox) and the "different entity" (in this case, ConSeal). What's more, one of the purposes of the relabeled additive regulations is to

permit a secondary entity, like ConSeal, to rely on an original manufacturer's Tier 1 data, like Ferox's, in manufacturing an additive unchanged in composition from the additive the original manufacturer registered with the EPA *without* the secondary entity itself having to engage in the evaluation and testing requirements.[7]

Ferox makes much of the fact that the phrase "private label" appears before the word "manufacture" in section 4.1 and contends that this somehow alters the meaning of the word "manufacture" into something other than its plain meaning. It argues, "'[P]rivate label manufacture' has a specific meaning under the regulations which limits it to the act of relabeling products it purchases from Ferox." Pl.'s Opp'n at 7. This is a wholly inaccurate statement. The Court has reviewed the entirety of 40 C.F.R. Part 79; nowhere in the text of those regulations are the terms "manufacture," "private label," or "private label manufacture" defined. The *Oxford English Dictionary* defines "private label" as "designating a product manufactured or packaged for sale under the name of the retailer rather than that of the manufacturer." Private-Label, *Oxford English Dictionary* (2016), http://www.oed.com/view/Entry/151601. Without any kind of statutory support for Ferox's argument, the Court struggles to comprehend its justification as to how placing the phrase "private label" before the word "manufacture" somehow makes the word "manufacture" no longer mean "make (a product, goods, etc.) *from*, (*out*) *of* raw material" or "produce by physical labor [or] machinery,"[8] but rather take on Ferox's assigned meaning of *relabel products purchased from someone else*.

What 40 C.F.R. Part 79 *does* define, however (as noted above), is "relabeled additive," and that definition explicitly permits the manufacture (*i.e.*, the making of or production by machinery) of a registered product under a different label and by a different entity. The only effect of the

---

[7] Considering this, Ferox's argument that the Agreement somehow "promotes illegal conduct," Pl.'s Mot. at 12, by granting a license based on these provisions is misplaced.

[8] Manufacture, *Oxford English Dictionary* (2016), http://www.oed.com/view/Entry/113770 (formatting in original).

addition of "private label" is a clarification that the products that ConSeal manufactured (as a private-label manufacturer) are products that were sold under its customers' and distributors' labels, not ConSeal's—which ConSeal readily admits. *See* Defs.' Reply at 6. Ferox argues that "there is a significant difference between granting a 'right to rely on an EPA registration for private label manufacture' and granting a 'right to manufacture' under a patent." Pl.'s Mot. at 11. The Court, however, sees no difference at all.

40 C.F.R. Part 79 also defines an "*additive* manufacturer": "any person who produces, manufactures, or imports an additive for use as an additive and/or sells or imports for sale such additive under the person's own name." 40 C.F.R. § 79.2(f) (emphasis added). The regulations governing the Agreement clearly contemplate that a "person" may engage in manufacturing *and/or* selling. Manufacturing and selling do not describe the same activity. Any interpretation by Ferox purporting that section 4.1, which grants a right to "manufacture, sale, and distribution *by ConSeal* . . . under the relabeling provisions of 40 CFR part 79," in fact provides only a right to sale and distribution of additives manufactured *by Ferox* undermines "the cardinal rule of statutory interpretation that no provision [of a statute] should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988) (opinion of Scalia, J.); *see also Colautti v. Franklin*, 439 U.S. 379, 392 (1979) ("[It is an] elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."). As ConSeal aptly notes, the language of the Agreement "does not provide for manufacture *by Ferox* or *for ConSeal*, but rather *by ConSeal*." Def.'s Reply at 3 (emphasis in original).

Furthermore, while the Court is cognizant of the principle that the terms of a contract must be interpreted in the context of the entire contract, *see Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014), Ferox's reliance on the Recitals at the beginning of the Agreement in arguing against the Court's finding of a license does not persuade. Ferox contends that the Recital

that states "ConSeal desires to access, market and distribute certain Ferox fuel additive products under ConSeal private labels and Ferox desires to enable such access, marketing and distribution" should close the door on any discussion of ConSeal having a right to manufacture the Accused Products. Citing to *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed. Cir. 1983), Ferox argues that "no contract provision should be '[c]onstrued as being in conflict with another unless no other reasonable interpretation is possible.'" Pl.'s Mot. at 12 (quoting *Johnson Controls*, 713 F.2d at 1555). Its interpretation is that this Recital controls and negates the inclusion of the word "manufacture" in section 4.1—the first substantive section of the Agreement. ConSeal's interpretation, by contrast, is that this Recital prefaces section *4.2* of the Agreement (which anticipates that Ferox and ConSeal may negotiate future agreements which would govern and provide for the supply *to ConSeal* of fuel additives manufactured *by Ferox*). ConSeal argues that a separate Recital—providing that "ConSeal is involved in the development, manufacture, marketing and distribution of various and sundry fuel additive products and formulations"—prefaces section 4.1 (which contains the language regarding ConSeal's manufacture). *See* Agreement at 1.

Ferox's argument and reliance on *Johnson Controls* leaves out a pertinent portion of that sentence: "[A]n interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *Johnson Controls*, 713 F.2d at 1555. In the Court's view, Ferox's interpretation would render an important portion of section 4.1 (explicitly mentioning manufacture) meaningless, while ConSeal's gives reasonable meaning to both the Agreement's recitals and its substantive provisions. A contractual provision should be "construed as being in conflict with another [only if] no other reasonable interpretation is possible." *Id.* (citing *Hol-Gar Mfg. Corp. v. United States*, 315 F.2d 972 (Ct. Cl. 1965)). Ferox advances the argument that the Recital conflicts with section 4.1, but it has not shown that no other reasonable interpretation exists, and it has done nothing to refute ConSeal's reasonable interpretation.

14

Ferox advances three other arguments against the finding of an express license. First, it asserts that "a patent license typically identifies the patent being licensed and includes language that mirrors the statutory rights, granting the right to 'make, use, sell, offer to sell' the invention claimed in the licensed patent." Pl.'s Mot. at 10. Second, it argues that because section 4.1 does not contain this language, does not mention Ferox's patent, and does not contain the word "license," and because Ferox's patent would not issue for more than two years after the Agreement was signed, the Agreement cannot contain a license. *Id.* And third, it contends that ConSeal's president was unaware of the '693 Patent until a month after the Agreement was executed; thus, ConSeal cannot claim the Agreement granted it a license to manufacture products later protected by Ferox's patent. *Id.* (citing Pl.'s Mot. Ex. G). According to Ferox, the "ordinary and common meaning" of section 4.1 is "clear" that the Agreement cannot grant to ConSeal a license to a patent that did not exist at the time. *Id.*

Putting aside for now that Ferox has not provided factual or legal support for any of these three arguments,[9] license agreements can be worded extremely broadly and are not nearly as restrictive as Ferox contends. *See, e.g.*, *TransCore*, 563 F.3d at 1276 ("[P]atent license agreements can be written to convey different scopes of promises not to sue, e.g., a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future." (quoting *Spindelfabrik Süssen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik AG*, 829 F.2d 1075, 1081 (Fed. Cir. 1987) (internal quotation marks omitted))); *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097, 1101 (Fed. Cir. 2004) (concluding that the operative agreement "grant[ed] [the licensee] an affirmative right to engage in the

---

[9] A party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *See Evers v. Gen Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (stating that "conclusory allegations without specific supporting facts have no probative value"). Though the Court cites the statements as they appeared in Ferox's own motion, Ferox also adopted its affirmative arguments in its opposition to ConSeal's motion for summary judgment. *See* Pl.'s Opp'n at 7.

manufacture and sale of [the alleged infringing products]. That grant comes without restriction of any kind"). Granted, the '693 Patent did not exist at the time of contracting, but that changes nothing. The Agreement gave ConSeal the right to rely upon Ferox's present and *any future fuel additive* registrations based on its Tier 1 data and to manufacture, distribute, and/or sell products as relabeled additives. After Ferox and ConSeal executed the Agreement, Ferox, based on the Tier 1 data it received from Econalytic, registered the biphenyl–ferrocene blend Ferox Powder 100. Ferox then applied for a registration, on ConSeal's behalf, for the unchanged-in-composition HeMax™-2-T. Pursuant to the Agreement, ConSeal then exercised its right to manufacture, distribute, and/or sell a relabeled additive—unchanged in composition from Ferox Powder 100—by manufacturing, distributing, and selling the Accused Products. By extending the right to cover "any future fuel additives," the Agreement specifically contemplated circumstances where Ferox would—at some point after the Agreement's execution—register a product that ConSeal was unaware of at the time of execution (or, hypothetically, even a product that *Ferox* had yet to create). No language in the Agreement exists that would invalidate this license simply because Ferox later acquired a patent for the biphenyl–ferrocene blend.

      In sum, based on a plain reading of section 4.1 and of the regulations incorporated by reference within it, the Court concludes that the Agreement grants ConSeal the right to take any of Ferox's fuel additives based on Tier 1 data for Ferox's EPA-registered iron atypical diesel fuel additives and iron atypical gasoline fuel additives—at the time of contracting or at any point in the future—and, relying on those registrations, manufacture, sell, or distribute products as relabeled additives. Thus, there can be no genuine issue of material fact that the Agreement expressly granted ConSeal a license to manufacture, distribute, and/or sell the Accused Products. Accordingly, ConSeal (and the distributor Defendants—Earth Eco, Genesis, and Green Foot) are entitled to judgment as a matter of law.

The Defendants' motion for summary judgment on Ferox's patent infringement claims shall be granted. Ferox's motion for summary judgment on this issue shall be denied.

B. *Fraudulent Inducement*

The parties dispute whether ConSeal has established a counterclaim against Ferox for fraudulent inducement, based on statements made by Ferox principals to ConSeal prior to the execution of the Agreement. ConSeal contends that Ferox made demonstrably false representations of two material facts: the cost of accessing Econalytic's Tier 1 data and the proportional share of that cost each party would provide to gain that access. It also contends that Ferox knew nearly two months prior to executing the Agreement that these statements were false, because it knew its agreement with Econalytic would cost only $185,000, not $250,000, and it knew that this necessarily meant ConSeal's payment of $125,000 was no longer an even "split." Ferox, in its own motion, argues that ConSeal cannot establish this claim because the Agreement, which contains only the provision that ConSeal would pay a "Use Fee" of $125,000, says nothing about these alleged misrepresentations.

Under Florida law, a party can establish a claim of fraud in the inducement if it shows proof of the following elements: (1) the representor made a false statement concerning a material fact; (2) the representor knew or should have known that the representation was false; (3) the representor intended to induce another party to act in reliance on the false statement; and (4) the party acted in reliance on the representation and was injured as a result. *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (citing *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985)); *see also Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1315 (11th Cir. 1998).

Regarding the fourth element, "it is a basic tenet of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties." *Barnes v.*

17

*Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996). Several courts in this District, relying on this statement from *Barnes*, have held that "[f]raudulent inducement claims will fail . . . where the subsequent contract simply says nothing about the allegedly false promise." *Leader Global Solutions, LLC v. Tradeco Infraestructura, S.A. de C.V.*, — F. Supp. 3d —, 2016 WL 146612, at *5 (S.D. Fla. Jan. 12, 2016) (quoting *Topp, Inc. v. Uniden Am. Corp.*, 513 F. Supp. 2d 1345, 1348 (S.D. Fla. 2007)) (internal quotation marks omitted); *see also Bluewater Trading LLC v. Fountaine Pajot, S.A.*, No. 07-61284, 2008 WL 895705, at *5 (S.D. Fla. Apr. 2, 2008) (same); *Cibran Enters., Inc. v. BP Prods. N. Am., Inc.*, 365 F. Supp. 2d 1241, 1253 (S.D. Fla. 2005) (same); *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999) (same), *aff'd*, 235 F.3d 1344 (11th Cir. 2000) (unpublished table decision). Furthermore, "a party cannot justifiably rely on representations not contained in a subsequent agreement . . . ***where the party participated in drafting the agreement and did not reduce the representations to writing***." *Corp. Fin., Inc. v. Principal Life Ins. Co.*, 461 F. Supp. 2d 1274, 1291 (S.D. Fla. 2006) (emphasis added) (citing *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 798 (11th Cir. 2005) (per curiam)).

The Agreement, which discusses only a "Use Fee" of $125,000 paid by ConSeal to Ferox in exchange for access to the Tier 1 data, contains none of the alleged misrepresentations. Any mentions of the total cost of the Ferox–Econalytic Agreement or of what share of that total cost ConSeal was contributing are conspicuously absent. But the record *is* replete with evidence that ConSeal participated in drafting the Agreement and did so with the benefit of counsel. Presumably, if such representations were material and necessary for ConSeal to enter into the Agreement, ConSeal would have included those representations in the express terms and conditions of the Agreement. But the Agreement "simply says nothing about the allegedly false promise[s]." *Leader Global Solutions*, 2016 WL 146612, at *5 (citation and internal quotation marks omitted).

18

Accordingly, the Court concludes that ConSeal's alleged reliance on these misrepresentations is unreasonable. Because ConSeal's reliance is unreasonable, it *cannot* satisfy the fourth element—acting in reliance—of its fraudulent inducement counterclaim. Therefore, the counterclaim fails as a matter of law.

Ferox's motion for summary judgment on the fraudulent inducement counterclaim shall be granted. ConSeal's corresponding motion shall be denied.

V. **CONCLUSION**

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

(1) the Defendants' Motion for Summary Judgment [ECF No. 42] is **GRANTED IN PART** as to the First, Second, Third, and Fourth Causes of Action of the Amended Complaint [ECF No. 7];

(2) the Plaintiff's Motion for Summary Judgment [ECF No. 45] is **GRANTED IN PART** as to Defendant ConSeal's Counterclaim [ECF No. 88]; and

(3) the Motions are otherwise **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 30th day of March, 2016.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE